## PUBLIC UTILITIES

### Environment − Calculation of Surcharge to Fund Environmental Trust Fund

January 17, 1994

*Mr. Frank O. Heintz*
*Chairman*
*Public Service Commission*

You have asked for our opinion concerning the correct interpretation of §3-302(b)(2) of the Natural Resources Article ("NR" Article), Maryland Code, and Article 78, §54B(c)(2) of the Code, each of which imposes a .15 mill per kilowatt hour cap on a surcharge used to fund the Environmental Trust Fund. The question has been raised by the most recent audit of the Public Service Commission, in which the Legislative Auditor questioned the interaction between the cap and the way in which the surcharge on consumers has been calculated.

The language of the statute as it now appears is ambiguous. Furthermore, the legislative history surrounding the initial Act indicates that the section, as then enacted, envisioned the surcharge calculation advocated by the Auditor. The legislative history of amendments in 1986 indicates, however, that the General Assembly was aware of the surcharge calculation being used by the Public Service Commission at that point and ratified it. Therefore, it is our view that the Public Service Commission has authority to continue to apply the cap in the way that it has.

I

### Statutes in Question

NR §3-302(a) and (b) provide as follows:

(a)    There is an Environmental Trust Fund. For the purpose of this subtitle, there is established as an added cost of generation, an environmental surcharge per kilowatt hour of electric energy generated in the State to be paid by any electric company as defined in the

Public Service Commission Law. This surcharge initially shall be assessed at 0.1 mill per kilowatt hour as of January 1, 1972. The Public Service Commission shall impose the surcharge per kilowatt hour of electric energy generated within the State and shall authorize the electric companies to add the full amount of the surcharge to customers' bills. To the extent that the surcharge is not collected from customers, the surcharge shall be deemed a cost of generation and shall be allowed and computed as such, together with other allowable expenses, for ratemaking purposes. Revenues from the surcharge shall be collected by the Comptroller and placed in the Fund.

(b) (1)  The Secretary, in consultation with the Director of the Maryland Energy Administration, annually shall coordinate the preparation of a budget required to carry out the provisions of this subtitle. Upon approval of the budget by the General Assembly, the Public Service Commission shall establish the amount of the surcharge per kilowatt hour for the fiscal year beginning July 1, 1972, and for each subsequent fiscal year.

(2)  Notwithstanding any other provisions of this subtitle, the amount of the surcharge for each account may not exceed the lesser of 0.15 mill per kilowatt hour or $1,000 per month and the surcharge may not continue beyond fiscal year 2000.

(3)  The Comptroller shall maintain the method of collection of the surcharge from the companies and the collections shall accrue to the Fund. The Department shall credit against the amount required to be paid into the Environmental Trust Fund by each electric company an amount equal to 1½% of the total surcharge attributed to each company on the basis of the electricity generated within Maryland.

Article 78, §54B(c)(1) provides that "[t]he Public Service Commission shall impose an environmental surcharge per kilowatt hour of electric energy generated within Maryland and shall authorize the electric companies to add the full amount of the surcharge to customers' bills." The remainder of the subsection parallels the language in NR §3-303. In particular, Article 78, §54B(c)(2) contains the same 0.15 mill per kilowatt hour cap as does NR §3-302(b)(2).

## II

### Alternative Interpretations

The Public Service Commission (the "PSC" or "Commission") has interpreted these provisions to require it to set two charges. The first, a tax on the utilities, is set by dividing the amount established for the budget by the amount of electricity likely to be generated in Maryland.[1] Each utility is then charged based on its anticipated generation. The PSC takes the position that the tax is not subject to the cap set out in NR §3-302(b)(2) and Article 78, §54B(c)(2). The second charge, a surcharge on consumers, is calculated by dividing the amount apportioned to each utility by the total amount of electricity to be sold. This consumer surcharge varies by utility but is never higher than the rate at which the tax is charged to utilities and is usually lower. This methodology has been consistently applied by the Commission since the Fund was established in 1971.

The Auditor has argued that, instead of spreading the surcharge over total kilowatt hours sold, it should be limited to those kilowatt hours of electricity generated in Maryland.[2] The effect of this

---

[1] The Commission has, from the beginning, referred to this charge as a "tax" on utilities. Report of the Public Service Commission of Maryland for the Year 1971, at 11. This office, and the courts, have agreed. *United States v. State of Maryland*, 471 F. Supp. 1030 (D. Md. 1979); 62 *Opinions of the Attorney General* 864 (1977). In this opinion, we use the term "tax" to refer to the charge to utilities and the term "surcharge" to refer to the charge to consumers.

[2] While it is not possible to tell how much of the electricity used by any consumer comes from in-state, it is possible to bill on this basis by assuming that the percentage of in-state and out-of-state electricity used by each consumer mirrors the overall percentage of each type sent out by
(continued...)

interpretation would be to apply the cap to the calculation of the tax paid by utilities. Until recently, this would have been a distinction without a difference, for both the tax and the surcharge were lower than the cap rate. In recent years, however, the tax has risen above 0.15 mill per kilowatt hour while the surcharge has remained below the cap.[3]

A greatly simplified example might clarify the difference resulting from the two approaches. Suppose that Utility A is assessed a tax of $20,000 to pay its share of the Environmental Trust Fund budget. Utility A generates 100 million kilowatt hours of electricity but sells 200 million kilowatt hours (getting the rest from out-of-state) to 20 customers, each of whom uses 10 million kilowatt hours. Under the PSC approach, Utility A recoups its $20,000 by charging its customers .10 mill per kilowatt hour *sold* to them, or $1,000 each. This is less than the statutory cap of .15 mill per kilowatt hour. Thus, Utility A would fully fund its portion of the Trust Fund budget. Under the Legislative Auditor's approach, Utility A could charge its customers no more than .15 mill per kilowatt hours *generated* in Maryland and sold to them. Since Utility A generates only half of the electricity that it sells, the most that each customer could be charged is $750 (.15 mill x 5 million kWh). Because Utility A would collect only $15,000 instead of $20,000, the Trust Fund budget would shrink by $5,000.

## III

### Analysis

The cardinal rule of statutory construction is to ascertain and effectuate legislative intention. *State v. Crescent City Jaycees Found., Inc.*, 330 Md. 460, 468, 624 A.2d 955 (1993). The starting point in this inquiry is the language of the statute. *Morris v. Prince George's County*, 319 Md. 597, 603, 573 A.2d 1346 (1990). The language is not read in isolation or out of context, however, but in light of the Legislature's purpose and in the context of the statute as a whole. *Crescent City Jaycees*, 330 Md. at 468. The purpose may

---

[2] (...continued)
the utility.

[3] For example, in Fiscal Year 1992, the tax rate was 0.167. The Auditor estimates that a 0.15 cap, applied to the tax, would mean that approximately $1,170,000 over the cap was collected in that fiscal year.

be reflected by such evidence as a bill's title and function paragraphs, amendments that occurred as it passed through the Legislature, its relationship to earlier and subsequent legislation, and other material. *Harris v. State*, 331 Md. 137, 146, 626 A.2d 946 (1993).

In addition, it is well-settled that the construction of a statute by the agency charged with its implementation is entitled to considerable weight. *Public Service Commission v. Howard Research & Develop. Co.*, 271 Md. 141, 151-52, 314 A.2d 682 (1974). Agency construction is particularly persuasive when it was developed contemporaneously with the statute and has been consistently applied, *Falik v. Prince George's Hospital*, 322 Md. 409, 416, 588 A.2d 324 (1991), and where the interpretation has been acquiesced in by the Legislature, *Morris v. Prince George's County*, 319 Md. at 613. *See also State v. Crescent City Jaycees,* 330 Md. at 470.

Here, the Power Plant Siting Program of the Department of Natural Resources (now called the Power Plant Research Program) and the PSC developed the surcharge system shortly after the law was passed and have consistently applied it for over 20 years. Moreover, as demonstrated by the legislative history discussed below, the General Assembly has ratified the Commission's interpretation. Thus, this interpretation is entitled to significant weight.

The language of the statute that places the cap on each "account" clearly indicates that the cap applies to the rate of the surcharge to consumers. However, it is less than clear whether the Legislature intended that the tax be passed through directly as a surcharge on kilowatt hours consumed that were generated in Maryland or whether it was anticipated that the tax would be folded into the rate charged on all kilowatt hours sold, wherever the electricity was generated.

Both NR §3-302 and Article 78, §54B(c) were enacted by Chapter 31 of the Laws of Maryland 1971. The bill title reflects that the purpose of the law was "to establish an Environmental Trust Fund from a surcharge on generated kilowatt hours of electric energy to be used to underwrite a power plant environmental research and site evaluation program and to insure longrange and timely planning for power plant site selection and acquisition." The preamble of the Act reflected "the intent of the ... General Assembly to insure orderly

governmental process without requiring the citizens of Maryland to pay excessive costs, either as taxpayers or as consumers."

The cap provision obviously was added to address the issue of excessive costs. That purpose is served either way that the cap is interpreted, however. While it is true that the Commission's interpretation can result in higher costs to consumers, the mere fact that they can be higher does not mean that they are "excessive." And the General Assembly could reasonably be concerned with the cost to consumers of all electrical energy consumed rather than with the cost of the variable percentage of electricity that is generated within the State.

The early legislative history of the provision lends some support to the Auditor's position. The 1971 Act provided, at former Article 66C, §763(a) and (b) as follows:

> (a) The Environmental Trust Fund, hereafter known as the "Fund," is hereby created, effective January 1, 1972. For the purposes of this subtitle, there shall be established as an added cost of generation an environmental surcharge per kilowatt hour of electric energy generated in Maryland by any electric company as defined in Article 78 of the Annotated Code of Maryland. Such surcharge shall be initially assessed at 0.1 mill per kilowatt hours as of January 1, 1972.

> The Public Service Commission shall take cognizance of the mandate by the General Assembly to impose the surcharge per kilowatt hour of electric energy generated within Maryland, *by authorizing the electric companies to add the full amount of the surcharge to customers' bills.* Revenues from the surcharge so required to be made by electric companies and collected by the Comptroller shall be placed into the special fund known as the Environmental Trust Fund.

(b)     Commencing with 1972, the Secretary of Natural Resources will each year coordinate the preparation of a budget required to carry out the provisions of this Act.  Upon approval of the Annual State Budget, by the General Assembly of the State of Maryland, the Public Service Commission shall establish the amount of the surcharge per kilowatt hour for the fiscal year beginning July 1, 1972, and for each subsequent fiscal year thereafter, but in no event shall it continue beyond 1985 nor shall it ever exceed 0.3 mill per kilowatt hour.

(Emphasis added.)  This language, while not completely free of ambiguity, lends itself readily to the interpretation that a single surcharge is to be set and passed on to consumers.  Budget analyses for subsequent years reflect this understanding.[4]  So did a review done for the Senate Budget and Tax Committee in 1981.[5] Furthermore, the Senate Budget and Tax Committee Floor Report on Senate Bill 329 of 1982 (Chapter 266) described that Act as "decreas[ing] the maximum allowable surcharge from 0.3 to 0.2 per kilowatt hour of electric energy *generated in the State*."  (Emphasis added.)

However, while the Legislature may have understood the law to impose a single surcharge paid by utilities and passed directly through to consumers, the PSC has, from the beginning, recalculated the customer surcharge based on kilowatt hours sold.[6]  This

---

[4] Analysis of the Maryland Executive Budget for the Fiscal Year Ending June 30, 1973, at 30.01.01a; Analysis for FY 1975, at 30.01.10a; Analysis for FY 1976, at 30.01.10.b; Analysis for FY 1977, at 30.01.10b; Analysis for FY 1978, at 30.01.15c.

[5] Reports of the Fiscal Committees for the 1981 Interim, Power Plant Siting Program at 14.  This report reflects the following averages of the surcharges on all the utilities: 1972, .10 mill; 1973, .15 mill; 1974, .17 mill; 1975, .18 mill; 1976, .22 mill; 1977, .21 mill; 1978, .23 mill; 1979, .15 mill; 1980, .14 mill; 1981, .16 mill.

[6] This approach is reflected in a study prepared by Exeter Associates, Inc. for Suzanne Bachur Watkins of the Power Plant Siting
(continued...)

approach was brought to the attention of the Legislature when it again considered amendments to the cap in 1986. In a letter to the Senate Budget and Tax Committee, dated March 11, 1986, the Department of Natural Resources explained the process this way:

> The "average" surcharge (to which the cap is applied) is currently 0.1414 mills per kilowatt hours. The cap is 0.2 mills per kilowatt hours.
>
> (Note: The surcharge rates of individual utilities [*i.e.,* the tax rates] vary widely, depending on a number of factors. For example, since the [tax] is based on the amount of electricity generated in Maryland, Potomac Edison's [tax] rate is much lower than BG&E's, since Potomac Edison generates a much smaller percentage of its electricity in Maryland than BG&E does.
>
> In general, the individual utilities' [tax] rates are smaller than the "average" surcharge rate. This is due to the fact that about 30% of the total surcharge revenues are paid by out-of-state ratepayers on electricity generated in Maryland and sold outside of Maryland. This reduces the amount of surcharge revenue needed from Maryland ratepayers, and results in reduced surcharge rates for Maryland utilities.)

The Senate Budget and Tax Committee Floor Report on Senate Bill 679 of 1986 (Chapter 683) reflects this understanding.[7] And changes made to the bill reflect acceptance of the administrative

---

[6] (...continued)
Program in September, 1983.

[7] A Fiscal Services Report on the program issued around this time, however, explains the statute as imposing a single surcharge "determined by dividing the approved Power Plant Siting Program budget by a projection of the total kilowatt hours that will be generated in the State." An Update on the Power Plant Siting Program, Analysis of the Maryland Executive Budget for the Fiscal Year Ending 1987, at 645.

interpretation. As introduced, the bill would have provided, in relevant part: "The surcharge may not continue beyond 1990 nor may it ever exceed 0.2 mill per kilowatt hour or $4000 per month for each customer, whichever is less. (Emphasis added.) In amending this bill, the General Assembly lowered the dollar cap to $1,000 per month, as suggested by the sponsor;[8] lowered the rate cap to .15 mill, a number below which People's Counsel had indicated that the program could not continue to function;[9] and changed the section to read more as it does today. Thus, when it learned of the PSC's practice, the General Assembly adopted language more consistent with that practice than the prior language and adopted a proposed cap that would have been calculated based on the actual practice. This history would indicate that, at least as of 1986, the General Assembly knew of the Commission's interpretation and approved of it.

## IV

### Conclusion

In summary, it is our opinion that the Public Service Commission has authority to calculate the environmental surcharge as it always has.

J. Joseph Curran, Jr.
*Attorney General*

Kathryn M. Rowe
*Assistant Attorney General*

Jack Schwartz
*Chief Counsel*
  *Opinions & Advice*

*Editor's Note:*

Since the issuance of this opinion, former Article 78, §54B(c) has been recodified at §7-203 of the Public Utility Companies Article.

---

[8] *See* Testimony on Senate Bill Number 679 before the Senate Budget and Taxation Committee, February 28, 1986.

[9] Letter from John M. Glynn, People's Counsel, to Delegate Larry Young, Chairman, Environmental Matters Committee, April 1, 1986.